COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  | § |  |
|---|---|---|
| TEXAS TECH UNIVERSITY HEALTH SCIENCES-EL PASO, | § | No. 08-18-00151-CV |
| Appellant, | § | Appeal from the |
| v. | § | 120th District Court |
| LORETTA K. FLORES, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2016-DCV3024) |

## O P I N I O N

The Texas Tech University Health Sciences Center-El Paso (TTUHSC-EP) appeals the trial court's denial of a plea to the jurisdiction seeking dismissal of an age discrimination suit brought by Texas Tech employee Loretta K. Flores. We will affirm.

### BACKGROUND

Flores was born in 1956. She first started her employment with Texas Tech in 1993, when the El Paso Health Sciences Center served as a regional campus for Texas Tech's medical school in Lubbock. Beginning as a medical secretary, Flores held multiple positions within the Health Sciences Center and was eventually assigned in 1997 to be the Executive Associate for Dr. Jose Manuel De La Rosa, regional dean of the El Paso campus. While working at Texas Tech, Flores received her bachelor's degree from the University of Phoenix, and in 2013, she received her

master's degree in business administration from the University of Texas at El Paso.

In 2007, Flores was reclassified to the position of Director, with Dr. De La Rosa remaining as her direct supervisor. At deposition, Flores testified that she and Dr. De La Rosa worked well together, that they got things accomplished, and that she was loyal to Texas Tech and respected the institution. Dr. De La Rosa praised her work in the position.

In May 2013, TTUHSC-EP opened up the Paul L. Foster School of Medicine and became a separate, standalone university within the greater Texas Tech University System. The Texas Tech Board of Regents selected Dr. Richard Lange to be founding president of the new university and medical school. Dr. Lange began working as university president on July 1, 2014. As part of the transition from Dr. De La Rosa's administration to Dr. Lange, Dr. De La Rosa's title remained in flux until he was eventually named as the university's provost on November 1, 2014. During the transition period, Flores continued serving as director and supported both Dr. Lange and Dr. De La Rosa. She received a merit-based pay raise in September 2014.

With respect to specific tasks, Flores testified at deposition that she assisted Dr. Lange with hiring the head of the Department of Institutional Advancement, and she assisted Dr. De La Rosa with other tasks. Flores testified that she entrusted Vanessa Solis with Dr. De La Rosa's calendar and his day-to-day activities. Flores took care of Dr. Lange's calendaring duty. However, at some point, Dr. Lange took calendaring duty away from Flores. She testified she did not recall the specific date that duty was taken away and that this occurred without any explanation. Flores also used to send out thirty-day notices for agenda items from the dean before a board of regents meeting. That duty was ultimately reassigned to Solis.

On January 13, 2015, the human resources department prepared a job description for the newly-created assistant to the president position; Dr. Lange testified at deposition that it was

possible this was done at his direction. A job description for the newly-created position of assistant to the president was posted publicly March 1, 2015. Dr. Lange decided to hire Vanessa Solis for the assistant position. Dr. Lange hired Solis without interviewing any other applicants, and he testified that he may have made the decision to hire Solis in either January or February, but could not remember specifics. Solis accepted the position on March 27, 2015. Solis, who was born in 1978, had been previously employed as an executive associate in the dean's office being supervised first by Flores and Dr. De La Rosa and then by Flores and Dr. Lange. Flores had originally hired Solis for the executive associate position several years prior. As a result of the reclassification, Solis received a raise in pay.

In May 2015, Dr. Lange called Flores into his office and informed her that she would no longer be classified as a director, that her job title and salary would change, and that she would no longer be working with him but instead solely with Dr. De La Rosa. According to Flores, when Dr. Lange informed Flores about her reclassification, Dr. Lange told her that he did not want her to retire.

The date of Flores' reclassification was August 1, 2015. Dr. Lange testified that he made the decision to have her work exclusively for Dr. De La Rosa, but that it was the HR department that decided her job description and classification level. Following her reclassification, Flores worked exclusively for Dr. De La Rosa in the Provost's Office under the title of Executive Associate. Her salary, which exceeded $85,000 when she held the position of director, was lowered to $64,000 when she was reclassified as Dr. De La Rosa's Executive Associate, although Dr. Lange stated in an affidavit that $64,000 was the maximum salary allowed for that position's salary range. As an Executive Associate, Flores made a higher salary than Solis, who was paid $58,291.44. Dr. Lange testified at deposition that some of the duties that Flores performed for him

3

were taken over by Solis. Dr. Lange testified that he told Dr. De La Rosa that Flores should continue to work for Dr. De La Rosa because she and him worked well as a team and because Dr. Lange wanted Solis for his position because he thought that she had a better skillset.

Dr. De La Rosa testified that at the Provost's Office, he delegated multiple assignments to Flores, ranging from simple assignments like coordinating his calendar to complex assignments like looking into initiating the accreditation process and hiring decisions. He further testified that his "style" was "to delegate to Loretta, and she basically runs the – runs the hoop to get things accomplished."

During the period for which she worked in the Director position, Flores received performance evaluations that rated her in different categories using a scale from 1 to 7. A score of 4 meant the worker "meets expectations," a score of 5 meant the worker was "occasionally above expectation," a score of 6 meant the worker was "frequently above expectation," and a score of 7 meant the worker was "always above expectations." In March 2014, Flores received an overall evaluation score of 5.74. In March 2015, Flores scored 6.10 overall. In February 2016, her overall evaluation score was 6.16. At deposition, Dr. De La Rosa admitted that he had input into the decision of Dr. Lange, and that he had told Dr. Lange that he did not think Dr. Lange and Flores "would make a good fit."

## DISCUSSION

In one issue, Texas Tech maintains that the trial court improperly denied the university's plea to the jurisdiction. We disagree.

### *Standard and Scope of Review*

A plea to the jurisdiction may challenge the jurisdictional sufficiency of the pleadings, the facts, or both. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). Where

4

a plea to the jurisdiction challenges only the substance of the pleadings, we look to see if the plaintiff has "alleged facts affirmatively demonstrating subject-matter jurisdiction." *Id*. But if the plea to the jurisdiction is aimed at the existence of jurisdictional facts, "we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim." *Id*. at 770-71.

Here, Texas Tech's plea to the jurisdiction challenged the existence of jurisdictional facts sufficient to demonstrate a colorable age discrimination claim and, by extension, waiver of sovereign or governmental immunity. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012)(TCHRA waives sovereign immunity). When the merits of a claim and the existence of subject-matter jurisdiction by virtue of an immunity waiver are intertwined and an agency brings forth its own jurisdictional evidence purportedly defeating subject-matter jurisdiction, we review a plea to the jurisdiction decision under the same standard of review used for summary judgments. *Alamo Heights*, 544 S.W.3d at 771. To avoid dismissal under this standard, a plaintiff must raise at least a genuine issue of material fact to overcome the challenge to subject-matter jurisdiction. *Id*. "In determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor[,]" though "we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Id*.

In employment cases, the *McDonnell Douglas*[1] burden-shifting framework guides our analysis. Under *McDonnell Douglas*, an employee must show a *prima facie* case of discrimination. *Id*. at 782. Once the employee makes a *prima facie* case, the burden shifts to the employer to

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

5

provide a non-discriminatory reason for the employment action. *Id*. If the employer can offer a non-discriminatory reason, the burden shifts back to the employee to show that the ostensibly non-discriminatory reason for the employment action was pretextual. *Id*. The employee must also show that discrimination was a motivating factor for the employment action, though not necessarily the sole factor. *See Michael v. City of Dallas*, 314 S.W.3d 687, 691 (Tex.App.—Dallas 2010, no pet.)(plaintiff must show either that (1) stated reason was pretextual or (2) defendant's reasons, while true, was only one reason for its conduct and discrimination was another, also known as a mixed motive case).

The level of evidence necessary for a plaintiff to survive a plea to the jurisdiction hinges on which stage of the *McDonnell Douglas* framework the defendant challenges as being insufficiently proven. "If the jurisdictional evidence does not negate or rebut the prima facie case, the ensuing aspects of the burden-shifting analysis are not implicated in the jurisdictional inquiry." *Alamo Heights*, 544 S.W.3d at 783. But if "jurisdictional evidence rebuts the prima facie case, the entire *McDonnell Douglas* framework is fully implicated, and sufficient evidence of pretext and causation must exist to survive the jurisdictional plea." *Id*. Notably, a plaintiff suing a governmental entity for age discrimination is not required to prove her case in its entirety in order to survive a plea to the jurisdiction; rather, the plaintiff must simply show there are fact issues ripe for jury resolution at each challenged *McDonnell Douglas* stage, be it the *prima facie* case or causation.[2] *See id*.

---

[2] Flores argues that we can affirm the trial court's decision based solely on the fact that the district court has the discretion to defer a ruling on jurisdictional issues where jurisdictional facts and the merits of the underlying case are so complex and intertwined that a decision on jurisdiction necessarily requires a detailed review of merits issues. Under these circumstances, we disagree that we can affirm the trial court on that ground.

The discretion-to-defer question is not necessarily a function of whether a searching review of complex merits issues is required to decide an immunity-related plea to the jurisdiction, but is instead based on the ultimate question of whether there are *apparent* genuine issues of intertwined material fact (which would justify a "delay" in the form of a denial of the plea to the jurisdiction to allow for ultimate jury/fact finder resolution) or *potential* genuine issues of

*Applicable Law*

The TCHRA prohibits age discrimination:

> An employer commits an unlawful employment practice if because of . . . age the employer . . . fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment . . . .

TEX.LABOR CODE ANN. § 21.051(1).

Because the Texas Legislature modeled the TCHRA on federal antidiscrimination laws and intended for state law to correlate with federal law, we may look to federal law in interpreting the TCHRA's provisions. *Bowen v. El Paso Elec. Co.*, 49 S.W.3d 902, 908 (Tex. App.—El Paso 2001, pet. denied).

---

intertwined material fact that have not yet been fully developed (which would justify a "delay" in the form of an abatement for targeted discovery). *See In re Tex. Parks & Wildlife Dept.*, 483 S.W.3d 795, 797 (Tex.App.—El Paso 2016, orig. proceeding)(relator not entitled to mandamus where trial court deferred ruling on plea to the jurisdiction for reasonable period of time in order to permit targeted discovery related to jurisdictional issues); *City of Granbury v. Willsey*, No. 02-17-00343-CV, 2018 WL 1324774, at *8 (Tex.App.—Fort Worth Mar. 15, 2018, no pet.)(mem. op.)(trial court has discretion to delay ruling to allow "reasonable opportunity for targeted discovery").

"When the consideration of a trial court's subject matter jurisdiction requires the examination of evidence, the trial court exercises its discretion in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case, mindful that this determination must be made as soon as practicable." *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004). However, case law establishes that when a plea the jurisdiction is filed in a case involving intertwined questions of sovereign/government immunity and the merits of a claim purportedly subsumed within an exception to sovereign/government immunity, a trial court should review the evidence under a summary judgment type standard and allow the case to move forward if there are triable issues of fact germane to the intertwined questions of the merits and jurisdiction, even if at trial a jury finds that those facts ultimately do not exist, the case fails on the merits, and consequently jurisdiction did not exist in retrospect. *See id*. at 227-28.

This process is not contrary to Flores' position that the trial court should not wade deeply into merits assessments in a plea to the jurisdiction or require her to prove her case in its entirety merely to survive a dilatory plea. *See State v. Lueck*, 290 S.W.3d 876, 884 (Tex. 2009)(stating that the burden of proof with respect to jurisdictional facts "does not involve a significant inquiry into the substance of the claims"). Rather, the genuine issue of material fact standard provides a framework within which the trial court may act in exercising its discretion; it may decide the jurisdictional issue on the plea if lack of jurisdiction is clear, or else it may defer resolving the jurisdictional issue if there are genuine issues of material fact on the intertwined jurisdictional/merits questions. *Miranda*, 133 S.W.3d at 227-28.

Because here there has been no allegation that the trial court based its decision on the need for more discovery and the trial court's exercise of "discretion" to defer resolution of the intertwined jurisdictional/merits issues for trial ultimately hinges solely on whether there are fact issues ripe for fact finder resolution, the focus of our opinion will necessarily be on the facts of this case as reviewed under a summary judgment-type standard.

7

### *Flores' Prima Facie Case*

Flores bears the initial burden of establishing a *prima facie* case of discrimination. Discriminatory treatment can be proven two alternative ways: either through direct evidence or circumstantial evidence. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012). Texas Tech correctly asserts that Flores here has no direct evidence of discrimination. Few plaintiffs do. Direct evidence is evidence that does not require a fact finder to make an inference. For there to be direct evidence of discrimination, an employer must essentially tell an employee "I fired you because you are disabled," *Beery v. Associated Hygienic Products, L.L.C.*, 243 F.App'x 129, 136 (6th Cir. 2007), or "I fired you because of your age." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000)(interpreting the federal Civil Rights Act). "For an age-based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *Russo v. Smith Int'l, Inc.*, 93 S.W.3d 428, 439 (Tex.App.—Houston [14th Dist.] 2002, pet. denied). Texas Tech directs us to case law in which the United States Court of Appeals for the Fifth Circuit has held that comments suggesting an employee retire does not constitute direct evidence of age discrimination. *See, e.g.*, *Martin v. Bayland, Inc.*, 181 F.App'x 422, 423 (5th Cir. 2006); *Hill v. Dept. of Veterans Affairs*, No. 08-60532, 2009 WL 348767, at *2 (5th Cir. Feb. 12, 2009)(not designated for publication).

When there is no direct evidence of discrimination, a plaintiff may prove her claim through circumstantial evidence, at which point the *McDonnell Douglas* framework applies. In making her *prima facie* case, Flores need only make a minimal showing. *Bowen*, 49 S.W.3d at 908-09. To establish her *prima facie* case, Flores must show:

(1) she is a member of a protected class;

(2) she suffered an adverse employment action;

(3) she was qualified for the job she had;

(4) she was

> (a) replaced by someone outside the protected class (true replacement);
>
> (b) treated less favorably than a similarly-situated employee who was outside the protected class (disparate treatment); or
>
> (c) otherwise subjected to an adverse employment action because of her protected characteristic.

*See Garcia*, 372 S.W.3d at 638 (true replacement standard); *Tex. Dept. of Aging & Disability Servs. v. Loya*, 491 S.W.3d 920, 924 (Tex.App.—El Paso 2016, no pet.)(citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004); *Dallas Indep. Sch. Dist. v. Allen*, No. 05-16-00537-CV, 2016 WL 7405781 (Tex.App.—Dallas Dec. 22, 2016, pet. denied)(mem. op.)(articulating difference between true replacement and disparate treatment).

Texas Tech specifically challenges the fourth element of Flores' *prima facie* claim, contending that she can show neither true replacement nor disparate treatment. Flores argues that she was replaced by Solis and, alternatively, that there are enough cumulative circumstantial factors that would allow her to proceed forward under a residual catch-all "otherwise subjected" theory.[3]

*True Replacement—Did Solis Replace Flores?*

We deal first with the issue of true replacement theory. Texas Tech argues that Flores cannot establish true replacement since the position Flores held as Director under Dr. De La Rosa and the position Solis held as Executive Associate under Dr. Lange were too dissimilar to be fair

---

[3] Flores does not appear to defend the trial court's judgment on disparate treatment grounds.

analogues of one another. We disagree. Fact issues remain as to whether specific duties transferred from Flores to Solis resulted in Solis taking over Flores' position.

In a case involving a protected-class employee being terminated and replaced by someone outside the protected class, the Texarkana Court has provided a helpful roadmap in navigating the replacement analysis:

> ***In the context of age discrimination, a terminated employee is replaced by another person when the terminated employee's position is filled by that person and that person is assigned the terminated employee's former job duties.*** Consequently, a terminated employee is not replaced by a person who temporarily assumes the terminated employee's job duties or a person who only takes over a part of those duties. When a terminated employee's job duties are distributed among other employees after termination, those employees do not replace the terminated employee. ***This is not to say, however, that . . . a terminated employee must be replaced by a new hire. It is possible for a terminated employee to be replaced by someone who already works for the employer so long as that employee completely takes over the terminated employee's job duties.*** This could be a common occurrence in a large company or an entity where promoting from within is the preferred method of hiring. ***A determination of whether an employee was actually replaced by another requires an inquiry into the job position and duties performed by the terminated employee, and an inquiry into the work performed by the person who is alleged to have replaced that employee.*** [Emphasis added].

*Baker v. Gregg Cty.*, 33 S.W.3d 72, 81–82 (Tex.App.—Texarkana 2000, pet. dism'd).

Although this case involves an alleged demotion and not termination, the same logic applies. The touchstone for determining whether there has been a replacement is not the title of a position but rather "the similarity of jobs held by the protected class employee and the person who allegedly replaced her." [Internal citation omitted]. *Allen*, 2016 WL 7405781, at *8.

Texas Tech maintains that Solis cannot be considered to be similarly-situated to Flores because Solis never occupied a director position; rather, Solis was named as assistant to the president, which was a position that had not previously existed since TTUHSC-EP had not previously been a standalone university with a president, and the director position Flores

10

previously occupied was eliminated. As such, in Texas Tech's view, Solis cannot have "replaced" Flores as a matter of law.

In support of its position, Texas Tech cites *Allen*, 2016 WL 7405781, at \*1. *Allen* involved the dissolution of an entire department within a school district and the subsequent founding of a new division to which members of the dissolved department were invited to apply. The Dallas Court held that the position held by the employee in the dissolved department was ranked lower and had less assigned responsibilities than the position in the newly-reorganized division for which she was not hired; while some of her former duties were subsumed into the new director position in the new division, the new director position also had additional expanded administrative responsibilities.

*Allen* hinged not on the dissolution of a position and the creation of a new position, but a person-to-person analysis of duties. Here, while Texas Tech asserts that Solis' duties as assistant to the president working under Dr. Lange are significantly different that the duties associated with Flores' position as director under Dr. Lange, Texas Tech never made clear in its opening brief precisely how those duties are different. In its reply brief, Texas Tech did identify a list of following tasks that Flores said she performed as director on a questionnaire from 2011 that were not carried over into the assistant to the president position.[4]

---

[4] These tasks, reproduced verbatim, include:

- Responsible for personnel management activities to include Executive Associate personnel within the Office of the Founding Dean and other areas as directed, submitting recommendation for employment, training, promotion, termination, orienting, supervising, and evaluating assigned personnel and providing guidance and support for professional development; establishing and implementing goals, objective, and standards for departmental operations and staff activities; delegating assignments for action and follow-up; and competition of annual evaluations in accordance to the institution's policies and procedures. (25% of daily tasks)

- Serves as 'Problem Solver' for or on behalf of the Founding Dean, resolving internal and external problem situations within the institution as needed. (25% of daily tasks).

- Collaborates closely with the Office of Faculty Affairs and Faculty Development in the coordination and

11

We note that this list of tasks represents her job in 2011 when she worked as director for Dr. De La Rosa, before TTUHSC-EP became a standalone university. We question whether this list of tasks represents the pared-down list of tasks that Flores performed in 2014 and 2015 for Dr. Lange, who described himself as more hands-on, before Dr. Lange chose to have Solis act as assistant to the president. The record is conflicting on that point. Indeed, many of the duties Solis exercised in her position administratively assisting Dr. Lange are similar to those duties Flores exercised while administratively assisting Dr. Lange, and Dr. Lange conceded in his deposition that Solis took over tasks that Flores performed. At least on the question of duty similarity, there appears to be a genuine issue of material fact as to whether Texas Tech reassigned Flores' duties to Solis.

Texas Tech also asserts that the reassignment of duties to an existing employee following a demotion does not constitute a "replacement," citing *Guajardo v. Univ. of Tex. Med. Branch at Galveston*, No. 01-17-00288-CV, 2018 WL 2049334, at *7-*8 (Tex.App—Houston [1st Dist.] May 3, 2018, no pet.)(mem. opn.). *Guajardo* is distinguishable. In that case, the hospital did not demote a protected class employee to promote a non-protected class employee. Instead, the protected class employee was demoted from nurse supervisor following disciplinary action and the non-protected class employee retained her position as lead nurse and assumed some of the nurse supervisor duties on an interim basis until she was promoted to nurse supervisor at a later date. Thus, the First Court of Appeals found there had not been a promotion, but a mere reassignment of duties. In this case, Dr. Lange informed Flores that she would be demoted near

facilitation of TTUHSC El Paso PLFSOM's faculty recruitment efforts including review of data for presentation to the CFAPTA, preparation and follow-up on all contractual and offer correspondence, maintenance of the department's faculty databases and archival of monthly appointments, and distribution of relative appointment information to departments. (15% of daily tasks).

12

the same time that he placed Solis into the assistant to the president position.

Bearing in mind that the standard for establishing a *prima facie* case is fairly lenient and that we must employ a summary judgment-type analysis in reviewing the trial court's decision, we believe there is enough evidence for Flores to establish her *prima facie* case under a true replacement theory.[5]  As such, we need not address Texas Tech's arguments related to disparate treatment or Flores argument that the trial court would have also been justified in deciding this case on residual other-evidence-on-the-basis-of-age grounds we identified as Prong (4)(c) in *Loya*.

### *Dr. Lange's Non-Discriminatory Reason*

Given that Flores established her *prima facie* case for discrimination, there is a presumption of discrimination.  The burden of proof shifts to Texas Tech to articulate a nondiscriminatory action for her title change and cut in salary.  "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).  An employer does not meet its burden to show a nondiscriminatory reason through argument of counsel or by merely pleading a nondiscriminatory reason in an answer to a complaint; the employer must actually point to some competent evidence in the record showing the existence of a legitimate nondiscriminatory reason.

---

[5] In reaching a final decision about replacement, we are mindful by Texas Tech's strongest point reiterated repeatedly in its brief: even after her ostensible demotion in favor of Solis' promotion, Flores still apparently made a higher salary than her replacement—Flores made $64,000 as Executive Associate to the Provost and Solis made $58,291.44 as Assistant to the President.  Texas Tech contends that this shows Flores cannot show unfavorable treatment as a matter of law and thus cannot establish a *prima facie* case for discrimination because she was, in fact, treated better than the person outside the protected class who replaced her.

As we read the case law, the salary-to-salary analysis is only relevant in a disparate treatment case, and we agree that this would pose a grave challenge to Flores had she asserted disparate treatment grounds defensively on appeal.  But she has not.  And because we decide that Flores meets her *prima facie* case on true replacement grounds—which only requires her to show she was replaced by someone outside the protected class—the salary-to-salary comparison is not strictly relevant.  We also do not decide whether Flores could also make out a *prima facie* claim under the residual discrimination theory that she was discriminated against because of age under the totality of the circumstances, though we agree that under such a broad approach the salary question would likely be a relevant factor to consider.

*Id.* at 254-55 & n.9. "[T]o rebut an employee's *prima facie* case, a defendant employer must articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee." *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004). "Bald and amorphous" statements about being "not sufficiently suited" for a position that could support either a discriminatory or nondiscriminatory motive is not sufficient to allow an employer to rebut the *prima facie* case. *Id.*

Texas Tech advances several nondiscriminatory reasons for its actions. First, Texas Tech asserts that Flores limited her complaints at deposition to issues of salary and "disavowed" other challenges, but that the university is paying her at the top of her salary range for the position she holds. Second, Texas Tech says that Dr. Lange articulated nondiscriminatory reasons: he did not believe that Flores' skillset he observed met the needs of the position, he lacked confidence in Flores' ability to supervised office staff, Flores did not take direction well, and that she had deficiencies in the quality of her work. We agree with Texas Tech that Dr. Lange's stated reasons are not bald assertions or vague, but go to the quality of work and skill, which is a nondiscriminatory reason. Texas Tech has met its burden to offer an ostensibly nondiscriminatory reason for the employment action.

### *Pretext and Causation*

In the presence of an ostensibly nondiscriminatory reason for the employment action, the burden shifts back to Flores to raise a fact issue showing the nondiscriminatory reason was pretextual and that age was a factor in the employment action taken.

Flores points to four factors that she purports show she should survive the third step of *McDonnell Douglas* scrutiny:

(1) Flores denied that she was not a 'good fit' with Dr. Lange and testified that she was adaptable, able to adjust whatever was needed, and that she was dedicated and

14

committed to the institution, which should create a fact issue countering Dr. Lange's testimony; Texas Tech counters that the plaintiff's 'subjective beliefs' alone are insufficient to show pretext. *See Romo v. Tex. Dep't of Transp.*, 48 S.W.3d 265, 270 (Tex.App.—San Antonio 2001, no pet.).

(2) Flores' performance evaluations were consistently above average, there is no documentation in the record indicating performance issues, and the Fifth Circuit has held that a jury can reasonably infer pretext 'when an employer's stated motivation for an adverse employment decision involves the employee's performance, but there is no supporting documentation[.]' *Lloyd v. Ga. Gulf Corp.*, 961 F.2d 1190, 1195 (5th Cir. 1992). On this point, Texas Tech has no response.

(3) Texas Tech indicated in an interrogatory that Dr. Lange made the decision to reclassify Flores, but Dr. Lange at deposition denied that he made the reclassification decision, insisting that he only reassigned Flores to work under Dr. De La Rosa and instructed HR to deal with the reclassification and salary issues. Texas Tech's HR director testified that she did not have hiring authority but that she only made a recommendation to Dr. Lange, who was free to either accept it or reject it.

(4) Dr. Lange did not give Flores a reason why she was being reclassified, but he did bring up the issue of retirement by asking her not to retire at the same meeting. He also asked about her age at another point. Texas Tech maintains these were stray remarks that do not, standing alone, constitute sufficient evidence of age discrimination.

In addition to the counterarguments made above, Texas Tech also points out that Dr. Lange was fifty-nine years' old at the time Flores, who was fifty-nine years' old, was reclassified. Texas Tech then cites federal cases in which courts have held that when the employer and employee are both in a protected age class, there is an inference against age discrimination.

While Texas Tech's arguments are well-taken, the standard to proceed to trial only requires Flores to raise genuine issues of material fact. Flores' countervailing testimony as to her ability, her positive performance evaluations, the lack of documentation of her negative traits, the conflicting evidence as to who made the ultimate decision on her reclassification, and Dr. Lange's remarks as to age, taken cumulatively, are enough to meet the standard. We, like the trial court, see fact issues here that would preclude a decision as a matter of law.

15

Issue One is overruled.

## CONCLUSION

Flores provided enough evidence to show fact issues at the *prima facie* and causation stages of the *McDonnell Douglas* analysis.  As such, the trial court properly denied Texas Tech's plea to the jurisdiction.  The judgment of the trial court is affirmed.

July 26, 2019

YVONNE T. RODRIGUEZ, Justice

Before Rodriguez, J., Palafox, J., and Larsen, Senior Judge
Larsen, Senior Judge (Sitting by Assignment)

16